# IN THE COURT OF APPEALS OF IOWA

No. 24-0787
Filed February 5, 2025

**CHRISTOPHER WESTERN and LYANN WESTERN,**
Plaintiffs-Appellants,

**vs.**

**CITY OF CEDAR FALLS, ADMINISTRATIVE COMMITTEE OF THE CITY OF CEDAR FALLS and CEDAR FALLS POLICE CHIEF MARK HOWARD,**
Defendants-Appellees.
_____

Appeal from the Iowa District Court for Black Hawk County, Joel Dalrymple, Judge.

Dog owners appeal the city's decision to "humanely destroy" their pet.
**WRIT ANNULLED.**

Jamie Hunter of Dickey, Campbell & Sahag Law Firm, PLC, Des Moines, for appellants.

Henry J. Bevel and Austin J. McMahon (until withdrawal) of Swisher & Cohrt, PLC, Waterloo, for appellees.

Heard by Tabor, C.J., and Schumacher and Chicchelly, JJ.

**TABOR, Chief Judge.**

Christopher and LyAnn Western appeal a decision by the City of Cedar Falls to "humanely destroy" their American bulldog, Reese. Their pet, according to the city council's administration committee, poses an "unreasonable risk of harm" to the public. The Westerns contend the record lacks substantial evidence to support that conclusion.

After four biting incidents, the city slated Reese for destruction, but the police chief gave the Westerns a second chance. Unfortunately, their lack of supervision led Reese to bite a fifth person—a teen riding by on a bicycle. Given that history, we find substantial evidence supports the city's determination that the dog poses an unreasonable risk of harm to public safety. So we must annul the writ.

## I.      Facts and Prior Proceedings

This is not the first time Reese has been in trouble with the city. In fact, it is the fifth time. His offending started in May 2021 when he bit a postal worker on her leg and hand. The next incident occurred in January 2022, when a police officer knocked on the Westerns' door. Reese "bolted" out, jumped on the officer, and bit his finger. The third offense followed in May, when another officer was returning the Westerns' other dog, who was running loose in the neighborhood. As that officer walked across the Westerns' lawn, Reese charged through the doggy door and bit the officer's hand. Then, in September, Reese again exited the doggy door and bit a city employee on the forearm.

After the fourth biting incident, the city impounded Reese as a "dangerous animal" under its ordinances. The chief of police, Mark Howard, determined that

Reese posed an unreasonable risk of harm to the public and ordered him humanely destroyed.

The Westerns appealed that decision, reciting that they had removed the doggy door and hired a contractor to build a fence around their backyard. They recognized Reese's "territorial behavior." But they insisted that he interacted with other dogs and people, including children, in the neighborhood and dog park regularly and without incident.[1]

Based on his owners' representations, Reese received a reprieve. Chief Howard agreed to release the dog back to the Westerns provided they met certain conditions. They had to remove the doggy door permanently; install a fence in their backyard and ensure Reese was supervised and restrained with a collar and leash until it was completed; and post signs on their property warning of the dog. The agreement cautioned that their failure to comply with those conditions "or any other incident involving Reese attacking or injuring any person or domestic animal or in which Reese constitutes a physical threat to any person or domestic animal, may result in Reese" being impounded and destroyed.

But Reese's reprieve did not last long. Less than a year later, the dog bit sixteen-year-old E.P. as he was riding by LyAnn's mother's house on his bicycle. The dog had been left untethered and unsupervised in the unfenced front yard. Police and an ambulance responded, and Reese was impounded again. Chief Howard decided that Reese posed an unreasonable threat to public safety and

---

[1] Their appeal included letters from friends and neighbors denying that Reese had ever been aggressive toward them or their children or pets and describing him as "loving," "noble and sweet," and well-trained.

should be destroyed. The Westerns appealed, and the city's administration committee held a hearing to take evidence and review Chief Howard's decision.

The Westerns resubmitted the letters from the previous appeal and a new letter from a neighbor, Tim Doyle, alleging that E.P. "provoked" the attack by kicking Reese. But E.P. denied provoking the dog, recalling that he was on the sidewalk when Reese ran up and bit him. Chief Howard stood by his 2022 decision that the animal should be destroyed for creating an unreasonable risk of harm to the public. He testified that the new incident showed that the Westerns' remedial measures had not worked.

By a vote of six to zero, the committee affirmed the chief's decision to humanely destroy the dog. In a written ruling, the committee reasoned that all the attacks were unprovoked, and the Westerns had taken "insufficient steps to prevent these attacks from occurring despite their agreement to do so." As its bottom line, the committee wrote: "Release of Reese would create an unreasonable risk of harm to the public."

To forestall the destruction of their pet, the Westerns petitioned for writ of certiorari to the district court. They submitted the entire record of the appeal, including an audio recording of the committee hearing. On certiorari, the Westerns argued there was an alternative course short of destroying Reese.

The district court found "further remedial actions" were not within its discretion under a writ of certiorari. It also noted it could not substitute its judgment for that of the city's administration committee. Rather, the court found its only function was to determine whether the committee acted illegally. The court found

substantial evidence supporting the committee's decision, so it annulled the writ. The Westerns appeal.

## II. Scope and Standard of Review

When an "inferior tribunal, board, or officer" executes a judicial function, a party may bring a certiorari action asserting illegality. *Ames 2304, LLC v. City of Ames*, 924 N.W.2d 863, 867 (Iowa 2019) (citation omitted). We review for the correction of errors at law. *K.C. v. Iowa Dist. Ct. for Polk Cnty.*, 6 N.W.3d 297, 301 (Iowa 2024). The party bringing the action must prove either "the decision violates a statute, is not supported by substantial evidence, or is unreasonable, arbitrary, or capricious." *Ames 2304*, 924 N.W.2d at 867 (citation omitted). Evidence is substantial if reasonable minds could accept it as adequate to reach the same conclusion. *Id.* We are bound by the committee's factual findings if they are supported by substantial evidence. *Id.* We may find evidence to be substantial even if we—as fact finder—would have drawn a different conclusion. *Bridgestone Americas, Inc. v. Anderson*, 4 N.W.3d 676, 681 (Iowa 2024).

## III. Discussion

For purposes of this case, a "dangerous animal" is "any animal which attacks or injures any person or domestic animal, or which constitutes a physical threat to any person or domestic animal." City of Cedar Falls, Iowa, Code of Ordinances ch. 6, art. II, div. 3, § 6-131 (2023). The parties agree that Reese fits that definition. Within the city, any law enforcement officer or animal control warden can impound or confine a dangerous animal if "in [their] discretion, [they]

believe[] that a dangerous animal poses an unreasonable risk or threat of harm to any person or domestic animal." *Id.* § 6-132.[2]

The Westerns contend there was not substantial evidence to justify destroying Reese.[3] The city code provides once a dangerous animal is impounded, it can be "humanely destroyed if, in the opinion of the chief of police, the release of such animal would create an unreasonable risk of harm to the public safety." *Id.* § 6-134(a)(3). The code requires the chief of police to "consider all of the circumstances, including, but not limited to, whether the animal's behavior was provoked by any person or other animal." *Id.* § 6-134(b). The dog owner has a right to appeal, as the Westerns did, and to be heard before the administration committee of the city council. *Id.* § 6-135(a). The administration committee can "[u]phold the decision of the chief of police" or "[m]odify or reverse [it], either in whole or in part," and return the animal to its owner with such conditions as it considers necessary to protect the public. *Id.* § 6-135(b).

The Westerns deny that the city's release of Reese would create "an unreasonable risk of harm to the public safety." They point to the letters submitted with their first appeal describing Reese as loving and friendly, a training class

---

[2] Alternatively, the officer or warden "may, in [their] discretion, leave a dangerous animal in the custody of its owner, upon receipt of the owner's written agreement to keep the dangerous animal in a secure enclosure" until further action is taken. Cedar Falls Code § 6-132.

[3] In their brief, the Westerns contend there was not substantial evidence to justify impounding Reese nor destroying him. Although the city does not raise error preservation, we note that the standards for impounding and for destroying use different but substantially similar language. The committee only decided that Reese is a dangerous animal and that he created "an unreasonable risk of harm to the public," the standard for destruction. So we limit our analysis to that question. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).

Reese completed before the fifth attack, their compliance with the prior agreement, the letter from Doyle that Reese was provoked, the record from the electric fence installed in the yard, and the minor degree of the victims' bite injuries.

At the hearing, Christopher conceded that Reese was "very protective" of the family but stressed that there had never been a problem outside their property. Christopher maintained that Reese was not a danger to the community but a part of it, interacting well with their neighbors and other animals. The Westerns acknowledged that it took them too long to recognize the dangers of the doggy door and the lack of a fence. But they had since installed a physical fence in their backyard and used Halo-brand wireless GPS fencing in their front yard. The Westerns believed that those measures satisfied their agreement with the city.

Focusing on the fifth incident, LyAnn testified that wireless fencing was also in place at her mother's house, and Reese was wearing his Halo collar that day.[4] The Westerns also point to the letter from Doyle, who stated he watched the incident from his property across the street. He wrote that E.P. was on the sidewalk but that he "kicked at Reese as the dog approached him from his yard," and "the dog bite incident may have been provoked."

At the committee hearing, E.P. testified that he was biking to a friend's house after school that day. Because he was unfamiliar with the neighborhood, he rode on the sidewalk and slowed in front of the house. As he put his foot down, a dog ran up and "latched" onto his leg. E.P. yelled, "Hey!" and the dog let go. E.P. then swung his leg to the opposite side, putting the bike between him and the

---

[4] At this time, LyAnn was caring for her mother and spending days at her mother's house with the family dogs.

dog. E.P. yelled for help, but no one came. So he called 911. Not until police arrived did LyAnn come out of the house to get Reese. E.P. was bleeding and had puncture wounds near his knee.[5] He testified he was on the sidewalk when Reese bit him and he did not provoke Reese in any way.

Relying on E.P.'s testimony—as well as Reese's biting history—we find substantial evidence to support the committee's finding that releasing the dog would create an unreasonable risk of harm to public safety. E.P.'s testimony could convince a rational trier of fact that Reese continued to pose too great a danger to the community after his first reprieve. A rational fact finder could assign more weight to E.P.'s testimony than to Doyle's unsworn account. Unlike E.P., Doyle was not present and subject to cross-examination at the hearing. And Doyle watched the incident from farther away. Although Doyle supposed provocation, the committee could have rejected his perception given E.P.'s closer view. The teen testified he did not even see the dog until it was running at him.

Although provocation was undefined, the committee could have reasonably concluded that a teen riding a bicycle on a public sidewalk when bitten by a dangerous animal was not the kind of provocation imagined as a defense under the city code. That code classifies an animal as "dangerous" after just one attack. *See id.* § 6-131. Because this is Reese's fifth attack, the evidence is substantial that his release back to the Westerns would create an unreasonable risk of harm to public safety.

---

[5] The Westerns submit it was a minor injury and point out that E.P. declined to go with the ambulance when it arrived. E.P. testified that he did not want to go in the ambulance because he had done it before and knew it was expensive. He went to the hospital later to have the wounds examined.

In seeking a reversal, the Westerns don't dispute that Reese bit E.P. Instead, they minimize the risk posed by their dog.  First, they argue that many friends and neighbors find Reese to be peaceful and loving.  But a reasonable fact finder could not ignore the five biting incidents and the circumstances that have repeatedly triggered Reese's admittedly "territorial" attacks.  Contrary to the Westerns' suggestion, technical compliance with the conditions for Reese's release in 2022 does not excuse Reese's continued aggression.  In any event, the doggy door removal and backyard fence were conditions for the Westerns' home, not the home of LyAnn's mother where the final incident took place.

Next, the Westerns point to a wireless fencing record that notified them if the dogs approached or crossed the perimeter.  The notifications show that the Halo collar on their other dog, Riley, set off warnings five times the day before the incident and three times the day of the incident.  The Westerns assert the lack of warnings from Reese's collar shows he did not leave the yard.  But a reasonable fact finder could read that exhibit differently.  Two notifications from Reese's collar dated two days before the incident say "Low Battery" with an estimated ninety minutes of power remaining and then "Battery Level Critically Low" with an estimated half hour remaining.  While LyAnn testified that she charges the collars every night, she agreed that E.P. was on the sidewalk when Reese bit him.  Yet Reese's collar didn't register that he crossed or even approached the line, as it did for Riley three times.  A reasonable fact finder could conclude that Reese's collar was not functioning that day.

Regardless of the collar, the committee could reasonably conclude that Reese presents an unreasonable risk to public safety while remaining within the

wireless fencing—both because it proved inadequate to prevent the fifth attack and because members of the public sometimes cross the lawn of a private home. A postal worker delivering mail, a repair person or police officer approaching the front door, or a child riding a bicycle are all members of the public who would face an unreasonable risk of harm from a dog so "protective" that it will attack a stranger for stepping inside the perimeter. A reasonable fact finder would not find those citizens to have provoked an attack.

The Westerns also point to the "minor" injuries that Reese inflicted on his victims to downplay the risk he poses. We agree that the severity of the injuries is a relevant factor. But a reasonable fact finder could conclude that bites leaving puncture wounds and drawing blood qualify as a danger to public safety.

The Westerns finally assert that the blame rests with them, and "human errors do not make the dog an 'unreasonable risk of harm.'" Having recognized their role, it is unfortunate that the Westerns squandered Reese's second chance.[6] The Cedar Falls Code reveals that city's low tolerance for biting animals. Yet the Westerns chose to leave Reese in the yard—unsupervised and without reasonable restraints. Left in that situation, the dog displayed the risk of harm he poses to the public by launching a fifth attack.

Substantial evidence supports the committee's findings, and we detect no illegality in its decision, so we must annul the writ.

**WRIT ANNULLED.**

---

[6] At oral argument, the city's attorney aptly asserted: "Reese didn't know he was on probation, but the Westerns did."